# EXHIBIT D

**Rebuttal Expert Report of**

**Karen M. Engstrom, CPA, ABV, CFE**

**October 26, 2022**



Alvarez & Marsal
**Disputes and Investigations, LLC**
One East Washington Street, Suite 1110
Phoenix, AZ 85004
Phone: +1 602 459 7000
Fax: +1 602 459 7001

# Maverix Metals Inc. and Maverix Metals (Nevada) Inc. v. Coeur Alaska, Inc.

Rebuttal Expert Report of Karen M. Engstrom, CPA, ABV, CFE

*Report Date: October 26, 2022*

AlvarezandMarsal.com

# Rebuttal Expert Report of Karen M. Engstrom, CPA, ABV, CFE
October 26, 2022

**Maverix Metals, Inc. and Maverix Metals (Nevada) Inc. v. Coeur Alaska, Inc.**

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................ 1
    A. Scope of the Engagement ................................................................................ 1
    B. Information Considered .................................................................................. 1
    C. Expert Qualification ....................................................................................... 1
II. WORK PERFORMED ....................................................................................................... 2
III. SUMMARY OF OPINIONS ............................................................................................. 2
IV. ANALYSIS OF THE PAPEK REPORT ......................................................................... 2
    A. THE PAPEK REPORT DOES NOT PROVIDE ANY BASIS TO SUPPORT THAT THE ADDED EXPLORATION AND DEVELOPMENT COSTS ARE "PERMITTED AND CONSISTENT" WITH THE TERMS OF THE ROYALTY DEED ................................................................................. 3
    B. THE PAPEK REPORT DOES NOT PROVIDE ANY OPINION REGARDING COSTS INCURRED FOR THE BENEFIT OF JUALIN PRIOR TO COMMERCIAL PRODUCTION AT KENSINGTON ............ 4
    C. DOCUMENTS PRODUCED BY COEUR IN CONJUNCTION WITH THE PAPEK REPORT SUPPORT THE OPINIONS IN MY INITIAL REPORT ........................................................................ 5

## EXHIBIT LIST

Exhibit A – List of Documents Considered
Exhibit B – CV of Karen M. Engstrom

## I. INTRODUCTION

### A. Scope of the Engagement

I was retained by Davis Graham & Stubbs LLP on behalf of its clients, Maverix Metals Inc. and Maverix Metals (Nevada) Inc. (together, "Maverix" or "Plaintiffs"). I have been asked to review and provide my rebuttal opinions regarding the Expert Report of Brent Papek dated September 26, 2022 ("Papek Report"). This analysis is also a supplement to my initial report dated September 26, 2022, which is incorporated by reference herein ("Initial Report").[1]

Our procedures were limited to those described in this report. In accordance with the terms of this engagement, this report is provided solely for the use of Counsel and Plaintiffs in connection with this matter. This report is not to be used with, circulated, quoted, or otherwise referred to in whole or in part for any other purpose without the express written consent of Alvarez & Marsal.

### B. Information Considered

I have considered information and records produced by Defendant subsequent to issuance of my Initial Report, as listed in the attached **Exhibit A**. I have not independently verified this information or validated these records.

All documents listed on Exhibit A to my Initial Report are also incorporated by reference. My analyses, opinions, and conclusions are based solely on the work performed by me and those under my supervision, through the date of this report. To the extent that Defendant's experts, including but not limited to Mr. Papek, modify their opinions, the conclusions in this report and my opinions may change. I understand discovery is ongoing. Therefore, this report is subject to change, modification, or supplementation should additional relevant information become available which bears on the analyses, opinions, or conclusions contained herein.

### C. Expert Qualification

I am a Managing Director at Alvarez & Marsal. A copy of my resume, which summarizes my experience and qualifications and includes a list of other cases in which I have provided expert testimony in the last four years, is attached as **Exhibit B**. My firm is being compensated at a rate of $625 per hour for my services.

---

[1] Unless otherwise noted, all defined terms used in this report retain the same definition as in my Initial Report dated September 26, 2022.



1

Case 1:21-cv-00021-SLG    Document 50-6    Filed 02/03/23    Page 4 of 15    EXHIBIT D
Page 3 of 14

## II. WORK PERFORMED

In order to develop my opinions in this matter, I performed various procedures, including: (i) reviewing the documents listed in **Exhibit A**; and (ii) reviewing the Papek Report.

## III. SUMMARY OF OPINIONS

Based on my analysis of the Papek Report as discussed in the remainder of this report, I have formed the following opinions:

1. The Papek Report does not provide any basis to support Mr. Papek's purported opinion that the Added Exploration and Development Costs are "permitted and consistent" with the terms of the Royalty Deed;

2. The Papek Report does not provide any opinion regarding costs incurred for the benefit of Jualin prior to Commercial Production at Kensington; and

3. Documents produced by Coeur in conjunction with the Papek Report support the opinions in my Initial Report.

## IV. ANALYSIS OF THE PAPEK REPORT

In the Papek Report, Mr. Papek offered the following opinions:[2]

> Papek Opinion 1: The $158,338,088[3] of post-commercial production exploration and development costs that were added by Coeur in the 2020 Q3 Recoupment Statement are permitted and consistent with the terms of the Royalty Deed, except as noted within the Papek Report.
>
> Papek Opinion 2: Additional costs added in subsequent quarterly Recoupment Statements are similarly permitted and consistent with the terms of the Royalty Deed, except as noted within the Papek Report.
>
> Papek Opinion 3: The post-commercial production exploration and development costs were systematically reported and classified in accordance with U.S. GAAP.

---

[2] Papek Report, at ¶ 12.

[3] Mr. Papek's quantification of the Added Exploration and Development Costs is slightly higher than the amount referenced in my Initial Report due to my exclusion of mining taxes related to Jualin.



2

> Papek Opinion 4: Where some costs included in Coeur's Construction Investment ("CCI") were also incurred partly for the benefit of any other properties or interests of Coeur (other than Kensington) ("Commingled Costs"), only the portion of such costs reasonably attributable to development and operation of Kensington were included in CCI. Coeur applied a reasonable and systematic approach to allocate such Commingled Costs to Kensington, and the allocation methodology is consistent with accepted mining & metals industry practices and supportable under U.S. GAAP.

As discussed more fully throughout this report, Mr. Papek's opinions are: (i) not relevant to whether the Added Exploration and Development costs were includible in CCI; and/or (ii) not substantiated.

Mr. Papek did not produce any workpapers or substantive exhibits with the Papek Report. Therefore, I am unable to opine on the adequacy of the data validation exercise described in the Papek Report. If validating the Added Exploration and Development Costs becomes relevant to the issues at-hand, then reperforming Mr. Papek's reconciliation would prove cumbersome based on the structure of the information cited by Mr. Papek and the absence of detailed workpapers.

If additional analyses, information, or reports are produced in this matter, I reserve the right to respond and comment as well as amend, change, or supplement this report and/or my Initial Report.

### A. The Papek Report Does Not Provide Any Basis to Support that the Added Exploration and Development Costs Are "Permitted and Consistent" With the Terms of the Royalty Deed

Papek Opinion 1 and Opinion 2 reflect Mr. Papek's opinion that the Added Exploration and Development Costs are "permitted and consistent" with the terms of the Royalty Deed. Notwithstanding Mr. Papek's inclusion of such language in his summary opinions, the Papek Report fails to provide any actual basis for that position. Instead, Mr. Papek performed a data validation exercise to (i) confirm that the costs were incurred by Coeur and were associated with Kensington and not Jualin,[4] and (ii) evaluate the completeness and accuracy of the recorded Added Exploration and Development Costs compared to underlying financial records.[5]

Mr. Papek's data validation fails to address the Royalty Deed's clear delineation of costs includible in CCI based on whether they were incurred *prior to* or *after* Commercial Production at Kensington and whether they were *capital* costs or *operating* costs related to *Gold Minerals produced* from Kensington. In fact, contemplation of the terms of the Royalty Deed is notably absent from Mr. Papek's analysis altogether.

---

[4] Papek Report, at ¶ 16.

[5] Papek Report, at ¶ 16-23.

3



Case 1:21-cv-00021-SLG   Document 50-6   Filed 02/03/23   Page 6 of 15

EXHIBIT D
Page 5 of 14

Similarly, Papek Opinion 3 addresses only that the Added Exploration and Development Costs were reported and classified in accordance with U.S. GAAP. As a public company subject to an audit, I do not question, nor am I aware of Maverix questioning, whether Coeur properly recorded costs on its financial statements. Mr. Papek's Opinion 3 does not relate to whether the Added Exploration and Development Costs were permitted to be included in CCI based on the terms of the Royalty Deed.

### B. The Papek Report Does Not Provide Any Opinion Regarding Costs Incurred for the Benefit of Jualin Prior to Commercial Production at Kensington

Coeur is obligated to exclude from CCI any costs related to Jualin under the terms of the Royalty Deed.[6] In arriving at Papek Opinion 4, Mr. Papek reviewed Coeur's allocation methodology related to certain Commingled Costs between Kensington and Jualin for 2022. Mr. Papek has not conducted a review of costs incurred by Coeur for the benefit of Jualin prior to 2022, let alone prior to Commercial Production in 2010, that were included in CCI.

I do not offer any opinion regarding the allocation methodology for Commingled Costs excluded by Coeur related to Jualin that were incurred post-Commercial Production. However, as discussed in my Initial Report, by 2017 (prior to the start of Commercial Production at Jualin in 2018 and prior to Coeur's revisions to the Recoupment Statements in 2020), Coeur identified specific proven and probable reserves at Jualin accounting for approximately 5.2% of the total reserves for Kensington Mine.[7] Based upon this allocation:

(i) if Coeur's pre-Commercial Production Base Recoupment Value is restated to exclude this same proportion of costs as attributable to Jualin, the Base Recoupment Value would decrease from $533.7 million to $507.7 million, a reduction of $26.0 million;[8] and

(ii) if Coeur's post-Commercial Production Acquired M&E Depreciation Expense and Asset Retirement Depletion Expense from 2010 through 2017 are adjusted to exclude this same proportion of costs as attributable to Jualin, CCI as calculated by Coeur would be reduced by an additional $2.0 million.[9]

---

[6] Royalty Deed (MAVERIX0000709-735), at MAVERIX0000712.

[7] See, Exhibit D.2 to Initial Report. For the purpose of this analysis, total reserves are calculated as the sum of all gold produced and then-current estimated proven and probable reserves.

[8] I updated this calculation from my Initial Report in order to not apply the pro rata reduction to the $32.5 million Kensington purchase price portion of Coeur's Base Recoupment Value as the Kensington purchase price included only the Kensington property. See Q4 2021 Recoupment Statement (CM_014004-005).

[9] Coeur applied a commingling percentage to post-Commercial Production Acquired M&E Depreciation Expense and Asset Retirement Depletion Expense beginning in 2018. See Q4 2021 Recoupment Statement (CM_014004-005).

4



### C. Documents Produced by Coeur in Conjunction with the Papek Report Support the Opinions in my Initial Report

As detailed in my Initial Report, Coeur's inclusion of the Added Exploration and Development Costs in CCI is not consistent with an application of accounting and economic principles to the terms of the Royalty Deed which draws a clear line at the start of Commercial Production and differentiates between capital and operating costs. After the start of Commercial Production and consistent with the Matching Principle in accounting, the Royalty Deed allowed CCI to include only operating costs related to the active production of Gold Minerals. To the contrary, capitalized costs, by definition, relate to future economic benefit and thus are not current operating expenses.

The principle of matching costs to economic benefit is explicitly referenced in Coeur's accounting policies that Mr. Papek indicated he considered in preparing the Papek Report. For example, Coeur's accounting policies state:

### Exploration

- Exploration costs are presented differently on the balance sheet and statement of comprehensive income depending on the phase or category of the drilling. These costs should be accounted for consistently on a period-over-period basis in a manner that will **match costs with the probability of future economic benefits** resulting from the exploration drilling and related activity.[10]

### Deferred Mine Development (exclusive of drilling)

- Mine development costs should be capitalized when incurred to develop new ore bodies, or significantly expand existing ore bodies. Prior to capitalization of costs, the ore body to be developed must be included in proven and probable reserves. Development costs should be capitalized only if, in total, they are greater than $50,000 and **have a benefit of one year or more.** Such costs should be accumulated and subsequently amortized on an ore body by ore body basis. If development costs are, in total, less than $50,000, they should

---

[10] Coeur's Exploration Accounting Standards (CM_46731), at 1 (emphasis added).

be expensed as incurred. All costs should be expensed if they are incurred prior to the determination that mineralization is considered to be proven and probable reserves.[11]

**Exploration and Mine Development (drilling)**

- The objective is to account for different types of drilling costs consistently from period to period and to **match the costs of the drilling being performed with probable future economic benefits**.[12]

Coeur's accounting policies clearly highlight that the accounting treatment of costs is dependent on the phase of mining operation in order to align costs with economic benefit. Both of these principles evident in Coeur's accounting policies align with the Royalty Deed's specification that prior to Commercial Production, Coeur could include capitalized costs related to the exploration and development of Kensington (*i.e.*, costs that *may* be matched to a future benefit) whereas after the start of Commercial Production, only operating costs related to Gold Minerals "produced" may be included in CCI (*i.e.*, costs that can be matched to a current benefit).

I reserve the right to change, amend, or supplement this report as any additional relevant information becomes available.

*Karen Engstrom*
_____

Karen M. Engstrom, CPA, ABV, CFE

October 26, 2022

---

[11] Extract from Coeur's Property, Plant, & Equipment and Mining Properties Accounting Policy (CM_46733), at Section 3.4 (emphasis added).

[12] *Id.*, at Section 3.6.1 (emphasis added).

# Exhibit A

# Exhibit A
## List of Documents Considered

### Produced by Coeur Alaska Inc.

| # | Doc | # | Doc | # | Doc | # | Doc |
|---|---|---|---|---|---|---|---|
| 1 | CM_46730 | 11 | CM_46740 | 21 | CM_46750 | 31 | CM_46760 |
| 2 | CM_46731 | 12 | CM_46741 | 22 | CM_46751 | 32 | CM_46761 |
| 3 | CM_46732 | 13 | CM_46742 | 23 | CM_46752 | 33 | CM_46762 |
| 4 | CM_46733 | 14 | CM_46743 | 24 | CM_46753 | 34 | CM_46763 |
| 5 | CM_46734 | 15 | CM_46744 | 25 | CM_46754 | | |
| 6 | CM_46735 | 16 | CM_46745 | 26 | CM_46755 | | |
| 7 | CM_46736 | 17 | CM_46746 | 27 | CM_46756 | | |
| 8 | CM_46737 | 18 | CM_46747 | 28 | CM_46757 | | |
| 9 | CM_46738 | 19 | CM_46748 | 29 | CM_46758 | | |
| 10 | CM_46739 | 20 | CM_46749 | 30 | CM_46759 | | |

### Expert Reports

35     Expert Report of Brent Papek with Exhibits dated September 26, 2022

# Exhibit B



**KAREN M. ENGSTROM**
**Alvarez & Marsal**
**Disputes and Investigations, LLC**
One East Washington Street, Suite 1110
Phoenix, AZ 85004
Phone: +1 602 459 7014
Email: kengstrom@alvarezandmarsal.com

## Karen M. Engstrom, CPA, ABV, CFE
## Managing Director

**Certifications**

Certified Public Accountant, Arizona

Accredited in Business Valuation

Certified Fraud Examiner

**Professional Affiliations**

American Institute of Certified Public Accountants

Arizona Society of Certified Public Accountants

Association of Certified Fraud Examiners

International Women's Insolvency & Restructuring Confederation

Women's White Collar Defense Association

**Education**

B.S. in Accounting, The University of Arizona

Karen Engstrom is a Managing Director with Alvarez & Marsal Disputes and Investigations in Phoenix. She is an experienced consulting and testifying expert in economic damages, valuation and solvency analysis, and forensic accounting.

With nearly 25 years of experience, Ms. Engstrom has provided affirmative and rebuttal expert testimony in trial, deposition, arbitration and mediation, including damage assessments, valuation and solvency analyses, and the interpretation of accounting and other financial metrics.

Ms. Engstrom has prepared expert reports on a variety of damage and valuation related issues in both commercial litigation and bankruptcy-related matters, including breach of contract claims, post-acquisition disputes, accounting malpractice, employment disputes, breach of non-solicitation and non-compete agreements, unfair competition, unjust enrichment, fraudulent conveyance actions, and a variety of other disputes. Ms. Engstrom has also provided forensic and investigative services and has conducted various types of compliance audits.

In a consulting capacity, Ms. Engstrom has advised independent parties and boards on complex fraudulent conveyance matters related to solvency and valuation, including as financial advisor to the Examiner in the Caesars Entertainment bankruptcy.

Ms. Engstrom has worked with clients across a wide range of industries, including aerospace, automotive, casino/gaming, commodities, construction, consumer products, financial services, government, healthcare, intellectual property, manufacturing, multi-level marketing, private equity, professional services, real estate, retail, technology, and transportation.

## Professional Experience

- Experienced in litigation, bankruptcy, and investigatory matters requiring damage assessments, business valuation and solvency analyses, and forensic accounting expertise.

- Provided expert testimony in trial, deposition, arbitration, and mediation, including valuation and solvency analyses, damage assessments involving lost profits, lost business value, and lost earnings, as well as other forensic accounting analyses.

- Prepared expert reports on a variety of accounting, damages, and valuation related issues, including both affirmative and rebuttal reports.

- Performed detailed analysis of financial models and complex data sets.

- Provided extensive consulting expert and financial advisory services regarding accounting matters, economic damages, and business valuation related to claims in federal court, state court, bankruptcy court, and alternative dispute resolution forums.

- Advised on typical damage assessments as well as on litigation strategy, including Daubert motions, demonstrative exhibits, and cross examination of opposing experts and fact witnesses.

www.alvarezandmarsal.com

**Testimony Experience** (Prior Four Years)

***In the Proceedings Before the Arbitration Panel Concerning the 2005 to 2007 NPM Adjustment Pursuant to Section XI(c) of the Master Settlement Agreement***
JAMS Arbitration; July 2022.

***Propulsion Aero International, Inc., a California Corporation v. Honeywell International, Inc., a Delaware Corporation***
Superior Court of Arizona, County of Maricopa; December 2021 (Trial).

***Hogs & Heifers of Las Vegas, Inc. v. 201 North 3rd Street LV, LLC; DT3 Manager, LLC; DTG Las Vegas, LLC a/k/a Downtown Grand; DTG Las Vegas Manager, LLC; and Fifth Street Gaming, LLC***
Eighth Judicial District Court, Clark County, Nevada; June 2021 (Trial).

***Hogs & Heifers of Las Vegas, Inc. v. 201 North 3rd Street LV, LLC; DT3 Manager, LLC; DTG Las Vegas, LLC a/k/a Downtown Grand; DTG Las Vegas Manager, LLC; and Fifth Street Gaming, LLC***
Eighth Judicial District Court, Clark County, Nevada; January 2021 (Deposition).

***L&W Supply Corporation v. Action Gypsum Supply, LP, a Texas limited partnership; Scott Creeger and April Creeger, husband and wife; Robert Jenkins and Stephanie Jenkins, husband and wife***
Superior Court of Arizona, County of Maricopa; January 2020 (Trial).

***AirPlay Adventures LLC, a Hawaiian limited liability company, and GoZip, a Hawaiian limited liability company v. ESJ Capital Partners, LLC, a Florida company, ESJ JI Leasehold, LLC, a Florida company, ESJ JI Operations, LLC, a Florida company, et al.***
Eleventh Judicial Circuit Court, Miami-Dade County, Florida; June 2019 (Trial).

***AirPlay Adventures LLC, a Hawaiian limited liability company, and GoZip, a Hawaiian limited liability company v. ESJ Capital Partners, LLC, a Florida company, ESJ JI Leasehold, LLC, a Florida company, ESJ JI Operations, LLC, a Florida company, et al.***
Eleventh Judicial Circuit Court, Miami-Dade County, Florida; March 2019 (Deposition).


**Publications and Presentations** (Prior Ten Years)

"The Devil is in the Details: Practical Tips to Evaluate Management Forecasts," Alvarez & Marsal *Raising the Bar* newsletter, September 2021.

"Gender Bias in the Courtroom: Overcoming Perceptions and the Data that Could Displace the Bias," Alvarez & Marsal *Raising the Bar* newsletter, March 2019.

Co-author of "The Financial Expert: Often the Link Between Damages and Causation" Alvarez & Marsal *Raising the Bar* newsletter, January 2018.

Co-author of Special Four-Part Series: A Look at the Caesars Bankruptcy from the Perspective of the Examiner's Financial Advisor, Part 2: "When a Fairness Opinion is Not Fair: Outdated Projections, Britney Spears and Market Multiples," Alvarez & Marsal *Raising the Bar* newsletter, September 2017.

Co-author of Special Four-Part Series: A Look at the Caesars Bankruptcy from the Perspective of the Examiner's Financial Advisor, Part 1: "Caesars' Liquidity and Solvency," Alvarez & Marsal *Raising the Bar* newsletter, February 2017.



Co-author of "Selecting 'The Right' Testifying Expert and Best Practices for Getting the Most Out of Your Expert During the Pretrial Phase of the Litigation," American Bar Association, Section of Litigation Expert Witnesses, April 2014.

**Professional and Business History**

FTI Consulting, Inc.: Director, Forensic & Litigation Consulting Practice

KPMG LLP: Senior Consultant, Forensic Practice

Arthur Andersen LLP: Senior Consultant, Dispute Practice

